Good morning, your honors. Steve D. Phillips appearing on behalf of Mr. Stringer, the petitioner and appellant in this matter. I think that the real starting point in this proceeding has to go to looking at the levels of incompetence and dereliction of duty that Mr. Stringer suffered at the hands of his three attorneys, starting with trial counsel, on with appellate counsel, and on with the habeas counsel. At trial, the counsel had an unbelievable theory. First, he refuses to investigate third-party culpability in this case, despite the fact that there's some very strong evidence connecting Mr. Russell to the homicide. He then essentially tells Mr. Stringer, you can't bring this in. It can't come in. Third-party culpability evidence doesn't come in. That's completely contrary to the California Supreme Court's decision in Hall. So under Hall, it should have been coming in. The counsel tells him it can't come in. And the counsel then has a theory on which he's going to beat this case. He's going to prove that there's no premeditation, and he's going to win the case. And even in 2007, at the hearing in Solano Superior Court, that attorney still stood on the fact that the only reason that my client was convicted was because the trial judge instructed on second-degree murder. Well, that has to be done. There was a case from the California Supreme Court six months prior to trial that directed that lesser-included offenses had to be instructed on, even if the defense said they didn't want the instruction. No, I'm wondering whether we're really looking at these merits issues when it seemed like the key here is whether there's tolling or not. Right. And perhaps I can tell you what my main concern is here. What was or one of them is whether after your client fired the counsel, the three-year delay, whether that's something that was reasonable, reasonable diligence to do nothing during those three years. Can you help me with that? Sure. And there's two aspects to that. And if I didn't mention it before, I do want to save two minutes for rebuttal in this matter. In answering your question, the time between I think it's June 9 of 2000 and the end of 2004, when the evidence starts to be looked into as to whether there's a basis for bringing forward a habeas petition, and that was done by myself, that time in there is premised upon the fact that what the habeas counsel did, and this was, you know, the third level of dereliction that Mr. Stringer suffered, was the habeas counsel essentially abandoned his clause from the beginning. He really didn't do anything. But this guy was a real manipulator, because ultimately you'll see that when he went to fee arbitration with Mr. Stringer's mother, he actually kept $8,000 of the $13,500 that he had been paid. Doesn't that create a problem for you? Let's just take as a given that there's an IAC claim for what happened until the time of the fee arbitration. But the reality is Mr. Stringer fired his lawyer, and he, his mother went to the State Bar seeking to get some of the attorney fees back on his behalf. Not the State Bar. This was a county bar fee arbitration. All right. But whatever it was, it was a bar association. And certainly no later than that, they, they, he knew absolutely that this guy wasn't doing a good job. He could not rely upon him, right? No. The only thing that he knew was that he didn't file the Federal petition. He was asked to file the Federal petition. He didn't file the Federal petition. And he lied to him and said, oh, I got a Federal extension for you. That's right. First he said that he got a Federal extension, but then it kept going along. Finally, Mr. Stringer said, you know, enough is enough. We've got to, we've got to do something about this. And at that point, what he tells Mr. Stringer, because he doesn't want this brought up to a court's attention, and this is where the manipulation comes in. Right, right. Well, but he fires him and then attempts to extract some money back. The, during this process, he, the lawyer says something to him. And then you're saying it's a reasonable diligence to rely on this exculpatory or this information from a lawyer that you fired for incompetence for three years and do nothing. And I didn't see a case that would say that's reasonable diligence. I could understand maybe if the attorney continued to be retained by him, but he was fired. So I'm having trouble with that period. The reason, the reason that this worked for the attorney was because he didn't actually lie to Mr. Stringer. What he did was he told Mr. Stringer the truth. You can't file a habeas petition. You're beyond the ADPA statute of limitations. That's true only if there's no tolling, right? That's right. So that was incorrect. That was not the truth. He was, because of the statutory inequitable tolling. It was technically the truth, but with a huge, huge caveat that he was leaving out the biggest aspect of it. Mr. Stringer believed that. You know, he had been through a string of incompetent attorneys, and that's why I talk about the fact that you've got huge incompetence at trial, you've got incompetence in the appellate level that the appellate counsel admits in a declaration, and then you have dereliction of duty on the part of the habeas counsel. But, counsel, forgive me. I get your argument, but the reality is you've got several different attorneys in each case. You know, you've got these awful attorneys. Let's just assume they're just this horrible. But after each case, your client waits for an extended period of time before engaging new counsel, before filing anything, and then you've got the issue of diligence. I don't – I'm struggling with how he shows diligence. I have to respectfully disagree with that, because he showed extreme diligence on his part for going to trial on the case, fighting his case through trial. He's convicted. He timely files a notice of appeal. He timely hires counsel for the appeal. He prosecutes the appeal. They don't bring up any of the correct issues, and that's the incompetence of that attorney. But then when it's decided, he then proceeds to go with a petition for review in the California Supreme Court. He does that in a timely basis. He gets his decision out of the California Supreme Court. He then on a timely basis hires habeas counsel to go after a Federal petition, and that habeas counsel starts from the get-go with not telling him the right things. These issues, the issues that I've brought up in this habeas, were never perfected in the State courts. They weren't exhausted issues. Those issues could not ever have been raised in a Federal petition. So what you had to do as that habeas counsel, you needed to go back and start again in Solano County Superior Court, as I did when I jumped on this. Later, what happens is he then gets told, you're out of luck. You cannot go back to Federal court. Federal court's gone for you now. He believes that. He then goes on, and what he starts doing is preparing himself for parole consideration. He starts working on the parole aspect of it. And I do a lot of parole consideration cases. I have a lot of cases versus the Governor and the Board of Parole hearings. I get in this court prior to Swarthout. Often on those cases. But the, you know, he's focusing on that. He's focusing on a new level of how he deals with the fact that he's been wrongfully convicted. He feels he has no rights at that point. He believes what he's been doing. Can I just ask one question here? Is your bottom line, so to speak, that there was affirmative misconduct on the part of the lawyer, not just ineffective assistance? It was affirmative misconduct by telling him he could not proceed. Absolutely. And the district court found that as well. That was a finding in the district court, was that there was more than just negligence. It was affirmative misconduct. Thank you, Your Honors, and may it please the Court. Rene Chacon for the State of California. This Court should affirm the district court. The district court just succinctly found that the State habeas, State habeas provided the filings of the State habeas provided no basis for tolling. They occurred after the statute of limitations had expired. Would you trace the timeline for me from the State's perspective? You've got an aggregate of one year unless there's equitable tolling. But from the State's perspective, when did the one year start running? When did it stop and then start again and so on? Do you have that with you? Not at the ready. It's in the briefing. Uh-huh. But there was a State habeas petition filed. Right. And that tolled. Right. But before the State habeas petition was filed, did the period start running at all and then got tolled during the State period? I'm just trying to see how far over the one year are we talking about in the aggregate. Ten years, Your Honor. Our estimation is 10 years. It's a long time, isn't it? A long time. Yeah. Now, the district court reasonably found equitable tolling up until June 9, 2000. That's the time when Petitioner and his mother fired Mr. Connor. But it took years after that still to file the petition in Federal court. He hired this gentleman who's representing him now in 2003. And it took a ---- He knows a lot about this. Right? And it took that counsel a year plus to file the petition as well. The elephant in the room is Mr. DeFilippis not actually falling on his sword and asserting ineffectiveness as well. He blames a negligent or a problematic defense investigator. Well, we know negligence is not enough here. It has to be more than negligence. Isn't that the real question here? Yes, Your Honor. And we think the district court fairly and succinctly found the pertinent facts, and we ask this Court to affirm the district court. Unless there are further questions, Ms. Pano, I would submit the matter. Well, I have further questions. I just want to be sure I understand the State's position on this. Mr. DeFilippis indicates that because of the affirmative misrepresentation by Mr. Conner, that his client, Mr. Stringer, didn't think he could do anything further. So that was roughly, I guess, June 9, 2000, you fired him. That's correct. And you got the hearing where they got money in May of 2001. So you got that period when they clearly didn't trust him, and he got some money his mother got some money back from him. But at that point, at the very least, Mr. DeFilippis was hired in 2003. That's correct. Under our case law, are we to take into account the expertise that Mr. DeFilippis had? He just indicated some of it. Because the State petition was not filed until June 5, 2006. Are we to take into account whether Mr. DeFilippis knew or should have known that something needed to be done if they were going to toll the statute? Ultimately, the actual innocence claim is that my brother-in-law did it. My brother-in-law shot my wife. That's a claim. Well, I'm sorry. I'm not talking about the Schlepp claim. I'm talking about the portion here dealing with the equitable estoppel. I realize Schlepp is a whole different deal. And my point is that the claims were actually evident and outstanding to the family, to Petitioner, and they sat on their rights. They knew they had a terrible counsel in Mr. Conner, yet they sat on their rights. But at the point where they hired a new counsel. So say instead of waiting between, for three years, between firing Conner and hiring new counsel, they had immediately hired new counsel. And then would it have been reasonable to rely on the new counsel's attempts to exhaust these various claims before filing in Federal court? Would we say that that was reasonably diligent, because he was relying, Mr. Stringer was relying on the expertise of Mr. DeFilippis? Well, it's murky, because Mr. DeFilippis was hired for a different purpose altogether, parole. Mr. DeFilippis was told to deal with the parole issues, and he did. But at some point he was. At some point, over a year later, he was told to look into the – but by then it was too late, Your Honor. So you're saying there was a delay of a year while he was working on the parole before he took on a different assignment? By Mr. DeFilippis' own declarations, yes. Well, let's assume arguendo that Mr. Stringer didn't meet his burden with respect to equitable tolling. The State does have a problem, doesn't it, though, on the McQuiggan matter. The district court indicated specifically that actual innocence under Schlupp does not toll the statute. That, of course, is now wrong, and as of McQuiggan v. Perkins, what are we to do with that? Send it back to the district court on that one sole issue? Did the district court address the McQuiggan claim? We briefed the – we briefed the – But did the district court? No. The magistrate – Was it raised to the district court? I didn't – what I saw in the petition to the district court was only a statement that he was actually innocent. Did they argue that actual innocence told the statute? Yes, Your Honor, and we briefed it. Where is that in the habeas petition in the record? It would be – it's not included in any of the extras for the record. Uh-huh. So it would be in the district court file. Okay. I didn't see the district court actually address that. Did the district court address a Mc – like a Levy-Lampert claim? No. No, Your Honor, although it was briefed. Okay. And do you know in what document it was briefed? Yes. I cited it in the statement of the case of my brief. I appeared there, and I – we argued Schlepp or argued against Schlepp. And it's in our briefing. Now, didn't the district judge – at least, I don't have a record cite either, but didn't the district judge indicate that actual innocence is not an exception to the statute of limitations? And if so, where? Yes. At that time, the law was – the law was not clear. Where is it? Well, we would cite to – our briefing is at Clerk's Record 19. No, I'm looking, and I think Judge Ikuda is looking for what the district judge said. Did the district judge specifically say, which at the time would have probably been correct, that there was no actual innocence exception to AEDPA's statute of limitations? But did he say that, or he or she say that? And if so, where? Yes. Page 117 of the excerpts of record of appellants – excerpts of record. Okay. Just read that little section. Is this the part where he says what he's talking about? Schlepp. I don't see Schlepp cited, so. No, there's a reference to Holland. Right, which is about reasonable diligence, but not about actual innocence, that there's equitable tolling. So where's the cite to Schlepp? Your Honor, I've misspoke. The district court did not cite Schlepp. And did it actually rule on whether actual innocence told the statute of limitations or not? No. Okay. Interesting. Okay. All right. Submittee orders. Okay. Any other questions for my colleagues? Very good. You have two minutes. Could you just start by saying whether you briefed the issue of whether actual innocence told the statute of limitations, and if so, where? Yes. And that would have been in the motion to dismiss that the Attorney General filed and our opposition to that. To the district court? In the district court. That was briefed. And where – do you have a record cite? I don't have a record cite. We didn't, unfortunately, include the motions with the – Let's assume, arguendo, that the district court didn't say anything about whether actual innocence was an exception to AEDPA. In that case, would we send it back under McQuiggan? Or do we just say, well, nothing is said, it is what it is, there's no – nothing raised about it? Well, there was something raised about it. It certainly was argued that actual innocence was a gateway through which we could pass under Schlapp. And the fact of the matter is, I think that the decision was in the early part of 2011. Lee v. Lampert was the original Lee v. Lampert prior to the Embank decision later in 2011. So I think that the district court decided this in that interim period and because of that did not address it properly in terms of the subsequent Embank decision, which more closely tracked what McQuiggan came out with. I think you have to also look at why was I hired. I was hired for a very different reason. I was not hired to look into the decision. And on a parole consideration matter, we're looking at a guilty client. Guilty client, does this guilty client get to go home on parole? And the issue is going to be how are they programmed in prison? So when did he hire you to look at the habeas issue? When did your assignment expand? He actually didn't – there was never a formal change in the representation.  The client ran out of funds. I continued to work on this because of my belief in the situation. And when was that? That would have been towards the latter part of 2004 when I was attempting – I started to get suspicions about this because trial counsel was just actively impeding my obtaining of his file because I started hearing ruminations about that there was perhaps a third-party culpability issue. I started looking into it. I asked for the file. I didn't get that until the fall. I think it was September of 2004. I then asked for the transcripts of the trial and went through those in the latter part of 2004, going through these things and started finding that there were significant issues. And that's 2004. The state habeas was filed January 5th of 2006. What I had to do was I had to hire an investigator. I had to look into what there was. And we started discovering the facts in the middle of 2005. It took a while to find some of these witnesses. Randy Russell is a migrant. Trying to find him and getting a statement out of him took quite a bit. There was some – in the latter part of 2004, he apparently made some statements to his children. We didn't find out about those until 2005. And I think you mentioned June of 2006 as being the date for filing the first state habeas. It was actually January of 2005 – or 2006, January 5th, 2006. If I said June, I'm mistaken. I meant January 5th, 2006. That's what my notes said. And the discoveries of everything that we used to support the petition was in 2005. Okay. Very good. Thank you very much for both your presentations. The case just argued is submitted.
judges: Nelson, Smith, Ikuta